1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARIBEL ALVARADO,

              Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social
Security Administration,

              Defendant.

Case No. SACV 14-1510 (SS)

**MEMORANDUM DECISION AND ORDER**

**I.**

**INTRODUCTION**

    Plaintiff Maribel Alvarado ("Plaintiff") brings this action seeking to reverse the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is

REVERSED and the action is REMANDED for an award of benefits consistent with this decision.

## II.

### PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income on July 28, 2010, and August 10, 2010, respectively. (AR 158-63, 164-68). Plaintiff alleged disability beginning on March 16, 2004. (AR 160, 164). Both applications were denied on initial review. (AR 111-14, AR 115—7). The applications were also denied upon reconsideration. (AR 118-22, 123-27). Plaintiff requested a hearing before an administrative law judge, and a hearing (the "ALJ Hearing") was held on August 6, 2012 in Orange, California, before Administrative Law Judge John Kays ("the ALJ"). (AR 128, 81-102). Plaintiff was represented by counsel. (AR 35, 156). Plaintiff testified at the hearing, along with Dr. Samuel Landau, a Medical Expert, and Alan Boroskin, a Vocational Expert. (AR 81-102). On September 20, 2012, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled and was capable of performing her past work as an office clerk. (AR 35-49). Plaintiff sought review of the ALJ's decision before the Appeals Council, which the Council denied on July 22, 2015. (AR 1). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1-6). Plaintiff filed this action on February 25, 2015.

\\

### III.

### FACTUAL BACKGROUND

Plaintiff was thirty-two years old at the alleged onset of her disability on March 16, 2004. (AR 160). She last worked in March or April of 2004 as an office clerk for an automobile finance company. (AR 89). She completed the eleventh grade. (AR 186). In her application, Plaintiff alleged that she suffered from bilateral carpal tunnel syndrome, back pain, depression and migraines. (AR 186). She alleges that she developed carpal tunnel syndrome at her last job, where an expert found that her work station was improperly set up with regard to the repeated reaching that was required. (AR 89-90).

A.   **Plaintiff's Medical History**

1.   **Mark Giglio, M.D.**

Dr. Mark Giglio is Plaintiff's general care physician, and records show that he has been treating Plaintiff on a monthly basis since approximately June 2006. (AR 2150, 2248). In July 2006, Dr. Giglio ordered a CT scan of the pelvis, which showed an enlarged spleen and liver as well as thickness and fluid surrounding the gallbladder. (AR 2336-37). In October 2006, Plaintiff presented with depression and requested a prescription to help with her alcohol addiction. (AR 2244). Plaintiff had increased her alcohol consumption in 2004, after her multiple carpal tunnel surgeries and resulting complications. (Id.). Dr.

3

1  Giglio diagnosed Plaintiff with alcohol dependence with episodic

2  drinking behavior and depression.  (AR 2246).  In March 2007,

3  Plaintiff reported that she completed an alcohol detoxification

4  program and that a psychiatrist, Dr. Michael Wu, was treating her

5  for depression.  (AR 2242).  Examination in June 2008 showed an

6  enlarged liver, though Plaintiff was not drinking again.  (AR

7  2232).  In April 2009, Plaintiff reported daily headaches for the

8  past two months, for which Dr. Giglio prescribed medication.  (AR

9  2218-19).  Dr. Giglio also referred Plaintiff to a neurologist

10 for migraine treatment.  (AR 2204-09).  In April 2011, an

11 ultrasound of the abdomen revealed an enlarged liver and spleen,

12 consistent with underlying cirrhosis.  (AR 2334).  In May 2011,

13 Plaintiff reported symptoms of depression, including fatigue,

14 sadness, weight gain, and a lack of motivation.  (AR 2193).  Over

15 the ensuing follow-up visits, Dr. Giglio continued to adjust

16 Plaintiff's antidepressant medications to relieve her symptoms.

17 (AR 2187-92).  In January 2012, Plaintiff reported that her

18 depression symptoms were controlled by a combination of

19 medications prescribed by her new treating psychiatrist, Dr. Greg

20 Sentenn.  (AR 2179).

21

22    In January 2012, Dr. Giglio completed a Multiple Impairment

23 Questionnaire on the basis of his monthly treatment of Plaintiff.

24 (AR 2150-57).  In the Questionnaire, Dr. Giglio noted the

25 following diagnoses: chronic major depression, alcoholic liver

26 disease with cirrhosis, lumbar disc disease, multi-factorial

27 headaches, hypothyroidism, carpal tunnel syndrome and fatigue.

28 (AR 2150).  Plaintiff's major symptoms included fatigue,

4

insomnia, nausea, headaches, weight gain, anxiety and depression. (AR 2150-51).   He estimated that Plaintiff could sit or stand/walk for no more than one hour each, with the need to get up every thirty minutes, and that she could lift and carry only five pounds frequently and ten pounds occasionally.   (AR 2153-54).   Plaintiff would have moderate limitations in her ability to perform fine and gross manipulations and reach with either arm due to carpal tunnel syndrome in both hands.   Id.   She could not keep her neck in a constant position.   (AR 2154).   Dr. Giglio indicated that Plaintiff's symptoms would "frequently" interfere with her attention and concentration, and she was capable of only a "low stress" work environment.   Plaintiff would also miss more than three work days each month due to her impairments.   (AR 2155-56).

### 2.   Rick Pospisil, M.D.

Dr. Rick Pospisil is Plaintiff's treating orthopedic surgeon.   Plaintiff first saw Dr. Pospisil on March 7, 2005 for pain in both wrists and in the low back.   (AR 936).   Dr. Pospisil diagnosed Plaintiff with carpal tunnel syndrome bilaterally, status post attempted release of right wrist on January 18, 2005, post-operative swelling and stiffness suggestive of a causalgia or complex regional pain syndrome and lumbar strain.   (AR 944-45).   EMG and NCV studies from March 18, 2005 were abnormal, the EMG consistent with ongoing moderate denervation due to right carpal tunnel syndrome and mild to chronic denervation due to left carpal tunnel syndrome, and the NCV consistent with moderate

1  to severe right carpal tunnel syndrome and moderate left carpal

2  tunnel syndrome.  (AR 948-51).

3

4      On May 25, 2005, an MRI of Plaintiff's right wrist ordered

5  by Dr. Pospisil revealed an ulnar artery aneurysm of the right

6  palm.  (AR 1013-14).  On September 20, 2005, Dr. Arthur Salibian

7  surgically repaired the aneurysm.  (AR 1056-57).  At the post-

8  operative follow-up visit on November 1, 2005, Dr. Salibian found

9  that Plaintiff could use Plaintiff's right hand without any

10 restrictions.  (AR 1090).  On November 2, 2005, Dr. Pospisil

11 noted that her right hand, low back and shoulder continued to

12 improve, but examination still showed complications with the left

13 wrist.  (AR 1085-88).  On November 28, 2005, Dr. Pospisil noted

14 that Plaintiff remained symptomatic in the left hand, reporting

15 pain, numbness and tingling in the left index finger, third

16 finger and thumb.  (AR 1094).

17

18     On January 20, 2006, Dr. Pospisil performed a carpal tunnel

19 release on Plaintiff's left wrist.  (AR 1133-34).  On May 1,

20 2006, an exam showed minimal swelling and good mobility with

21 negative Phalen's signs in both wrists and no dysthesias, but

22 Plaintiff was still reporting numbness and tingling in both

23 wrists with radiation into all fingers.  (AR 1169-70).  On June

24 28, 2006, Plaintiff reported that she felt numbness and tingling

25 in her hands, the left worse than the right.  (AR 1178).  On

26 January 15, 2007, Plaintiff continued to have dysesthesias in

27 both hands, the left worse than the right, with mid- and upper

28 back pain.  (AR 1214-15).  Plaintiff reported the same symptoms

at monthly visits between February and July 2007. (AR 1222-52).
On October 1, 2007, the examination showed spasm and tenderness
in the low back, with slight restriction of lumbar mobility, as
well as dysesthesias to light touch. (AR 1293). Dr. Pospisil
precluded Plaintiff from repetitive fine motion of either hand or
lifting more than fifteen pounds with either hand. (AR 1294).

     In January 2008, Dr. Pospisil adopted a workers'
compensation Agreed Medical Examiner's restrictions on
Plaintiff's abilities, precluding Plaintiff from repetitive fine
motion of the hand and lifting more than fifteen pounds. (AR
1329). Dr. Pospisil added the need for Plaintiff to change
positions as necessary and avoid all pushing, pulling, carrying,
and lifting because of her back symptomatology. (AR 1329). In
February 2008, Plaintiff noted that the back pain had worsened,
and Dr. Pospisil precluded her from more than occasional fine
motion of the hands, lifting more than fifteen pounds, carrying
and/or lifting more than fifteen pounds and pushing or pulling
more than twenty pounds. (AR 1334). He again reported that
Plaintiff needed the opportunity to change positions as necessary
to relieve pain.

     On April 30, 2008, Dr. Pospisil diagnosed Plaintiff with
lumbar strain with lower extremity radiculopathy, supported by
MRI findings. (AR 1364). On January 12, 2009, Plaintiff
reported continued pain in her low back, radiating into her lower
extremities, and pain in both wrists. (AR 1498-99). Plaintiff's
symptoms and Dr. Pospisil's clinical findings remained constant

1    throughout regular visits between February and December 2009.

2    (AR 1509-12, 1547-48, 1574-77, 1591-94, 1608-11, 1643-46, 1659-

3    62, 1677-80, 1692-95).

4

5    On September 19, 2011, Dr. Pospisil completed an Upper

6    Extremity Impairment Questionnaire on the basis of his treatment

7    of Plaintiff since 2008. (AR 2125). He diagnosed Plaintiff with

8    cervicogenical headaches, lumbar disc protrusion, and residual

9    carpal tunnel syndrome status post three release procedures. (AR

10   2125). In the Questionnaire, Dr. Pospisil opined that Plaintiff

11   could lift or carry only ten pounds occasionally and five pounds

12   frequently, had moderate limitations in her abilities to perform

13   gross and fine manipulations with her right hand, moderate

14   limitations in her abilities to reach with either arm, would need

15   to take ten to fifteen minute breaks four to six times a day, and

16   that she would likely miss three or more workdays each month due

17   to her impairments. He also marked that Plaintiff's impairments

18   restricted her from all pushing, pulling, kneeling, bending and

19   stooping. (AR 2130).

20

21   **3.   Andrew Morovati, M.D.**

22

23   Dr. Andrew Morovati, a neurologist, began treating Plaintiff

24   for migraines on March 3, 2011. (AR 2104). Dr. Morovati works

25   with Dr. Jack Florin, another treating neurologist. (AR 2104).

26   Plaintiff began seeing Dr. Florin in March 2010 and reported

27   suffering headaches on a daily basis for the last two years. (AR

28   838-39). Dr. Florin diagnosed chronic migraine without aura and

cervical dystonia.   (AR 839).   Dr. Florin treated Plaintiff's migraines with Botox, and Plaintiff reported that the Botox injections provided a five to ten percent improvement in the severity of her headaches and that she was only headache-free for five to six hours each day.   (AR 832).   On October 12, 2010, Dr. Florin completed a Treating Physician's Migraine Headache Form and indicated that Plaintiff's headaches occur more than once a week, lasted an average of two to three hours each, two to three times a day, caused nausea, photophobia, phonophobia and were throbbing and pulsating.   (AR 841).   He indicated that Plaintiff had a "fair" response to Indocin, Botox, Cymbalta, Tylenol and Topamax and had failed nerve blocks.   (Id.).   He opined that the migraines would interfere with her ability to work and cause her to miss two to three days of work per week.   (Id.).   In September 2011, Plaintiff reported that the Botox injections were ineffective and the oral medications were not working either. (AR 2347).

Dr. Morovati began to treat Plaintiff for migraines in March 2011.   (AR 2104).   Dr. Morovati treated her every two to three months.   (AR 2143).   He described her migraines as "uncontrolled" and "severe, daily, and unresponsive to multiple treatment modalities."   (AR 2104).   On October 25, 2011, Dr. Morovati completed a Headaches Impairment Questionnaire on the basis of his treatment of Plaintiff.   (AR 2143-48).   In the Questionnaire, Dr. Morovati wrote that Plaintiff's headaches were severely intense, accompanied by nausea and photosensitivity, occur daily for up to eight hours, or sometimes the entire day, without any

specific triggers. (AR 2144). He opined that her symptoms are frequently severe enough to interfere with her attention and concentration, that she would be incapable of tolerating a "low stress" work environment and that she would likely miss more than three days of work each month because of her headaches. (AR 2146-47).

**B.**   **Examining Physician's Opinion**

On March 25, 2011, state agency examining psychiatrist Fahmy Ibrahim, M.D., performed a psychiatric evaluation of Plaintiff. (AR 1931-35). Plaintiff reported feeling depressed since she developed carpal tunnel syndrome and stopped working in 2004. (AR 1932). She also stated that she is unable to work because of low back pain, limitations on her standing and sitting and migraines. (Id.). Dr. Ibrahim reported that Plaintiff was able to dress and bathe herself, tried to do house cleaning and cook and had good relationships with her family and friends. (AR 1933). He reported that Plaintiff's mood was depressed and her affect restricted. (Id.).

In his functional assessment, Dr. Ibrahim wrote that Plaintiff's ability to maintain focus and concentration is mildly limited, her ability to understand and carry out complex or detailed instructions is mildly to moderately limited and her ability to cope with workplace stress is mildly to moderately limited. (AR 1934). Plaintiff's ability to relate and interact \\

with co-workers, colleagues and supervisors is normal, as is her ability to understand and carry out simple instructions.  <u>Id.</u>

**C.   <u>Medical Expert's Opinion</u>**

Dr. Samuel Landau testified at the ALJ Hearing that Plaintiff suffered from degenerative disc disease of the neck and low back, bilateral carpal tunnel lesions with pain, persistent pain and headaches. (AR 83-84). Dr. Landau opined that Plaintiff's impairments would affect her ability to function. (AR 84). Plaintiff could only stand and walk for two out of eight hours each day, could sit with breaks every two hours, could lift and carry ten pounds frequently and twenty pounds occasionally and could occasionally stoop or bend.  <u>Id.</u>  She could climb stairs but could not climb ladders, work at heights or balance.  <u>Id.</u>  She was restricted from operating heavy equipment or motorized vehicles, working around unprotected machinery, or doing work where the safety of others could be compromised.  <u>Id.</u>  She could engage in occasional neck motion, but should avoid extremes, and should hold her head in a comfortable position at other times.  <u>Id.</u>  She could occasionally hold her head in a fixed position for fifteen to thirty minutes at a time.  <u>Id.</u>  She was precluded from forceful gripping, grasping, or twisting, but not from frequent fine and gross manipulation as required for keyboarding, opening drawers and carrying files.  <u>Id.</u>

\\

\\

Dr. Landau opined that Plaintiff could engage in frequent fine and gross manipulation despite bilateral carpal tunnel syndrome because the carpal tunnel was released and the aneurysm repaired.   (AR 85-86).   Dr. Landau also acknowledged that the release may not have "made any difference at all . . . in her symptoms."  (AR 86).

**D.   <u>Vocational Expert</u>**

Vocational Expert ("V.E.") Alan Boroskin identified Plaintiff's past work in the Dictionary of Occupational Titles ("DOT") as "office clerk."  (AR 98).   He noted that Plaintiff performed this work at the sedentary level, though the DOT classifies it as light.  <u>Id.</u>

The ALJ then posed two hypotheticals to the V.E.  First, the ALJ proposed a hypothetical individual with the same education, training and work history as Plaintiff who was limited to standing and walking for no more than two hours each day and could sit without restriction, but required breaks every two hours.  (AR 99).  She could lift and carry ten pounds frequently and twenty pounds occasionally and could stoop and bend occasionally, but was precluded from jobs requiring her to use ladders, ropes, or scaffolding, work at heights or requiring balance, operating heavy equipment or motor vehicles, or being responsible for the safety and welfare of others.  (AR 99-100). The individual was also precluded from jobs that required forceful gripping or grasping, but she could engage in frequent

fine and gross manipulation such as keyboarding, and could occasionally hold her head in a fixed position for fifteen to thirty minutes at a time, though only in a comfortable position. (AR 100). The V.E. testified that that such a hypothetical individual would be able to perform Plaintiff's past work. (Id.). However, if the hypothetical individual could only occasionally use her hands for fine manipulation and gross handling, she would not be able to perform Plaintiff's past work as an office clerk. Id. Additionally, if the hypothetical individual experienced extreme pain for up to one third of the day that prevented her from focusing on simple and repetitive tasks, she could not work. (AR 100-01). In response to a second hypothetical, the V.E. testified that a hypothetical individual who misses two days of work a month regularly would not be able to do any work. (AR 101).

**E.   Plaintiff's Testimony Before The ALJ And Statements On Her Benefits Application**

Plaintiff testified that she suffers from carpal tunnel syndrome in both hands. (AR 89-90). After her carpal tunnel surgeries, Plaintiff continued to experience symptoms of bilateral carpal tunnel syndrome, including numbness and the feeling that her hands "fall[ ] asleep." (AR 86, 93). She also had problems typing. (AR 93). She was able to hold onto and lift light objects, but her hands would spasm if she lifted heavy objects, and she "can't get a good grip." (AR 93-94). Plaintiff \\

13

testified that she cannot lift anything more than five or ten pounds and that "it can't be like an everyday situation." (AR 100).

Plaintiff also described her back pain. (AR 94-95). She could sit for only fifteen minutes at a time, alternating with standing fifteen minutes. (AR 94). She had not had surgery on her back because she was afraid this would interfere with her ability to interact with her young child. Id.

Plaintiff testified that she suffered from migraines, a condition for which she saw a neurologist. (AR 95). She experienced migraines every day, and they sometimes lasted for over a week. Id. She tried different treatments for her migraines, but "nothing works." Id. When experiencing a migraine, she would lie down, close her eyes in a dark room, and ice or heat her forehead. Id. Plaintiff also testified that she saw a psychiatrist to treat her depression and experienced blurry vision. (AR 96, 97).

Plaintiff did not have any difficulties with personal care. (AR 206). She cared for her husband and two sons, aged nine and nineteen, and a pet, prepared meals, performed household chores, read, watched television, drove a car, took her mother and grandmother to doctors' appointments, had lunch with a friend occasionally, and shopped on a weekly basis. (AR 205-09, 90). It took her a long time to complete household chores and she sometimes needed help to complete these tasks, as well as to

14

bathe and change her clothes.   (AR 207, 98).   She admitted to being an alcoholic but stated that she had not had any alcohol in the last five years.   (AR 97).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months.   <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.   <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.   20 C.F.R. §§ 404.1520, 416.920. The steps are:

\\

\\

\\

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

(1) Is the claimant presently engaged in substantial
    gainful activity?  If so, the claimant is found
    not disabled.  If not, proceed to step two.

(2) Is the claimant's impairment severe?  If not, the
    claimant is found not disabled.  If so, proceed
    to step three.

(3) Does the claimant's impairment meet or equal one
    on the list of specific impairments described in
    20 C.F.R. Part 404, Subpart P, Appendix 1?  If
    so, the claimant is found disabled.  If not,
    proceed to step four.

(4) Is the claimant capable of performing his past
    work?  If so, the claimant is found not disabled.
    If not, proceed to step five.

(5) Is the claimant able to do any other work?  If
    not, the claimant is found disabled.  If so, the
    claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R.
§§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

The claimant has the burden of proof at steps one through
four and the Commissioner has the burden of proof at step five.
Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an
affirmative duty to assist the claimant in developing the record
at every step of the inquiry.  Id. at 954.  If, at step four, the
claimant meets his burden of establishing an inability to perform

16

past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity, age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 49).  At step one, the ALJ found that Plaintiff had not been engaged in substantial gainful employment since her alleged onset date of March 16, 2004.  (AR 37).

At step two, the ALJ found that Plaintiff had the severe impairments of status-post bilateral carpal tunnel releases,

17

degenerative disc disease of the lumbar spine, cervicalgia and cervical dystonia and headaches. Id. The ALJ also found that Plaintiff's other impairments, such as blurry vision, erosive gastritis and depression, were not severe. (AR 38). The ALJ found that Plaintiff's depression caused only mild limitations in the functional areas of daily living, social functioning and concentration, persistence or pace, and no extended episodes of decompensation, and was therefore non-severe. (AR 37-38).

At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of from of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404 1520(d), 416.1525, 414.1526, 416.920(d), 416.925, 416.926). (AR 41). The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to:

> lift and carry twenty pounds occasionally and ten pounds frequently; sit without restrictions but stand or walk for only two hours in an eight-hour work day; never climb ladders, ropes, or scaffolds; never balance; only occasionally stoop or bend; never perform forceful gripping or grasping and only frequently perform fine and gross manipulation; only occasionally hold her head in a fixed position for fifteen to thirty minutes at a time and must hold her head in a comfortable position; never operate heavy equipment or motor vehicles; never work at heights; and never

18

perform jobs involving the safety operations or the safety and welfare of others. _Id._

The ALJ also specified that, in reaching this opinion, he had considered all symptoms and the extent to which these symptoms could reasonable be accepted as consistent with the objective medical evidence and the other evidence. _Id._ He stated that he considered opinion evidence in his finding as well. _Id._

In considering Plaintiff's symptoms, the ALJ followed a two-step process in which he first determined whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the Plaintiff's pain or other symptoms. _Id._ Next, after the underlying impairment(s) had been shown, he evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's functioning. _Id._ The ALJ reviewed the specific findings of Plaintiff's physicians and questioned their findings, ultimately finding that the opinion of the testifying medical expert, Dr. Landau, found the greatest support in the medical record. (AR 48). Accordingly, the ALJ gave "great weight" to Dr. Landau's testimony. (_Id._).

The ALJ questioned Plaintiff's testimony and stated that Plaintiff's "allegations of generally disabling symptoms and limitations are not corroborated by the evidence of record," noting that Plaintiff's activities, such as caring for her two

sons and husband, performing household chores, taking her mother and grandmother to the doctor, having lunch with a friend, and working in her son's classroom, are "inconsistent with allegations of disability and indicate that [Plaintiff] is capable of performing appropriate work activities on an ongoing and daily basis." Id. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements about the intensity, persistence and limiting effects of these symptoms were not credible. Id.

At step four, the ALJ found that Plaintiff is capable of performing her past work as an office clerk and that such work does not require the performance of work-related activities precluded by Plaintiff's RFC. (AR 48-49). The ALJ opined that this finding was consistent with the testimony of the Vocational Expert, Mr. Boroskin. (AR 49). As a result, the ALJ found that Plaintiff was not disabled. Id.

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Auckland v. Massanari, 257 F.3d 1033,

1   1035 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F. 3d at 1097); <u>Smolen</u>

2   <u>v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing <u>Fair v.</u>

3   <u>Bowen</u>, 885 F.2d 597, 601 (9th Cir. 1989)).

4

5       "Substantial evidence is more than a scintilla, but less

6   than a preponderance." <u>Reddick</u>, 157 F.3d at 720 (citing <u>Jamerson</u>

7   <u>v. Chater</u>, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant

8   evidence which a reasonable person might accept as adequate to

9   support a conclusion." <u>Id.</u> (citing <u>Jamerson</u>, 112 F.3d at 1066;

10  <u>Smolen</u>, 80 F.3d at 1279). To determine whether substantial

11  evidence supports a finding, the court must " 'consider the

12  record as a whole, weighing both evidence that supports and

13  evidence that detracts from the [Commissioner's] conclusion.'"

14  <u>Auckland</u>, 257 F.3d at 1035 (quoting <u>Penny v. Sullivan</u>, 2 F.3d

15  953, 956 (9th Cir. 1993)). If the evidence can reasonably

16  support either affirming or reversing that conclusion, the court

17  may not substitute its judgment for that of the Commissioner.

18  <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y of Health &</u>

19  <u>Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

20

21                              **VII.**

22                           **DISCUSSION**

23

24      Plaintiff contends that the ALJ improperly assessed and

25  rejected the opinions of Plaintiff's treating physicians.

26  (Compl. 18, 21, 23). Plaintiff also contends that had the

27  treating physicians' opinions been given proper weight, she would

28  have been found disabled. (Compl. 25). This Court agrees.

**A.    The ALJ Improperly Rejected The Treating Physicians'**
**Opinions**

Plaintiff claims that the ALJ's finding that Plaintiff can perform frequent fine and gross manipulations like keyboarding, the lifting and carrying requirements of light work and the non-exertional requirements of full-time work is based on an erroneous rejection of the opinions of treating physicians Pospisil, Giglio and Morovati. (Compl. 21, 23). The Court agrees.

The Ninth Circuit recognizes three types of physicians: (1) treating physicians, who examine and treat, (2) examining physicians, who examine but do not treat, and (3) non-examining physicians who neither examine nor treat. Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009). Treating physicians are given the greatest weight because they are "employed to cure and [have] a greater opportunity to know and observe the patient as an individual." Magallanes v. Bowen, 881 F.3d 747, 751 (9th Cir. 1989); Thomas v. Barnhart, 278 F. 3d 947, 956-57 (9th Cir. 2002); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). Accordingly, where the treating physicians' opinion is refuted by another doctor, the ALJ may not reject this opinion without providing specific, legitimate reasons, supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995); see also Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008). Where the treating physician's

22

opinion is not refuted by another doctor, the ALJ must provide clear and convincing reasons for rejecting the treating physician's opinions. See <u>Lester</u>, 81 F.3d at 830; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202 (9th Cir. 2001). The opinion of a non-examining, non-treating physician does not constitute substantial evidence to justify rejecting the opinion of either an examining or a treating physician unless it is consistent with and supported by other evidence in record. <u>Lester</u>, 81 F.3d at 831; <u>Morgan v. Comm'r of Soc. Sec.,</u> 169 F.3d 595, 600-01 (9th Cir. 1998). However, treating physicians' opinions are not given more weight if they are conclusory or not supported by medical evidence. <u>Batson v. Comm'r of Soc. Sec.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

Here, the opinions of treating physicians Pospisil and Giglio are contradicted by the opinion of Dr. Landau. Because Plaintiff's treating physicians are presumed to be in the best position to assess Plaintiff's functional limitations, the ALJ must provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting their opinions. See <u>Lester</u>, 81 F.3d at 830; see also <u>Magallanes</u>, 881 F.2d at 751. The ALJ found that Dr. Pospisil's assessments were inconsistent and lacked support in the record, and that Dr. Giglio's opinions also lacked support in the record. These reasons are not legitimate because substantial evidence in the record does, in fact, support the treating doctors' opinions.

\\

\\

Dr. Pospisil, Plaintiff's treating orthopedic surgeon, treated Plaintiff on a monthly basis, beginning in 2005, for both her upper extremity and spinal impairments.  Dr. Pospisil also performed one of her carpal tunnel release procedures.  Despite undergoing three procedures to treat her bilateral carpal tunnel syndrome, Plaintiff continued to report numbness and tingling in both hands, and examinations showed that Plaintiff had dysesthesias in both hands along with back pain.  (AR 1169-70, 1178, 1214-15, 1222-52, 1293).  In October 2007, Dr. Pospisil precluded Plaintiff from repetitive fine motion of either hand or lifting more than fifteen pounds with either hand.  (AR 1294). In January 2008, Dr. Pospisil again precluded Plaintiff from repetitive fine motion of either hand or lifting more than fifteen pounds with either hand.  (AR 1329).  In January 2008, Dr. Pospisil also precluded Plaintiff from all pushing, pulling, carrying and lifting "because of her back symptomatology."  Id. In February 2008, Dr. Pospisil precluded Plaintiff from fine motions of the hands "more than occasionally," lifting more than fifteen pounds, carrying and/or lifting more than fifteen pounds and pushing or pulling more than twenty pounds.  (AR 1334).  In September 2011, Dr. Pospisil completed an Upper Extremity Impairment Questionnaire in which he opined that Plaintiff could lift or carry only ten pounds occasionally and five pounds frequently, had moderate limitations in her abilities to perform gross and fine manipulations with her right hand, moderate limitations in her abilities to reach with either arm, is restricted from all pushing, pulling, kneeling, bending and stooping, would need to take short breaks four to six times a

day, and that she was likely to miss three or more workdays a month because of her impairments. (AR 2125-30). Dr. Pospisil's assessments were not consistent with Dr. Landau's testimony, which placed fewer restrictions on Plaintiff's abilities. (AR 84).

The ALJ rejected Dr. Pospisil's more restrictive assessments of Plaintiff's abilities because of alleged internal inconsistencies in his assessments. (AR 42-43). Specifically, the ALJ opined that Dr. Pospisil's February 2008 assessment, allowing for Plaintiff to push and pull up to twenty pounds, was inconsistent with his opinion in the 2011 Questionnaire, which precluded all regular pushing and pulling and applies to Plaintiff's symptoms and limitations as early as 2007-08. Id. The ALJ also opined that the 2011 Questionnaire was inconsistent with Dr. Pospisil's October 2007 limitations report because the former imposed only minimal limitations on fine manipulations with the left hand, and the latter precluded all continuous, repetitive fine motion with either the left or right hand. Id. Although these assessments did identify different limitations, it is likely that Plaintiff's condition was worse when Dr. Pospisil completed the 2011 Questionnaire due to the passage of time. Instead of addressing this likelihood, however, the ALJ rejected the findings of the physician who had been treating Plaintiff for nearly a decade.

Dr. Giglio, Plaintiff's primary care provider, was the only other treating physician to have assessed Plaintiff's functional

1    limitations due to residual carpal tunnel symptoms.  In January

2    2012, Dr. Giglio completed a Multiple Impairment Questionnaire,

3    finding that Plaintiff could lift or carry only ten pounds

4    occasionally and five pounds frequently and that she would have

5    moderate limitations in her ability to perform fine and gross

6    manipulations and reach with either arm.  (AR 2152-54).  The ALJ

7    rejected Dr. Giglio's opinion, finding that it was contradicted

8    by the opinion of other doctors, including Dr. Pospisil.  (AR 45-

9    46).   However, Dr. Giglio's assessment in the January 2012

10   Questionnaire was almost identical to Dr. Pospisil's September

11   2011 assessment, save for Dr. Pospisil's conclusion that

12   Plaintiff was moderately limited in her ability to perform fine

13   and gross manipulations with only the right hand.  (AR 2129,

14   2152-54).   Accordingly, there was no basis for the ALJ to

15   conclude that Dr. Giglio's opinion was contradicted by the

16   findings of Plaintiff's other physicians.

17

18       The ALJ found that Dr. Giglio's "conclusions...lack

19   support," but the medical evidence undermines this conclusion.

20   (AR 46).   Moreover, the ALJ failed to provide specific and

21   legitimate reasons, supported by substantial evidence in the

22   record, for rejecting Drs. Pospisil and Giglio's opinions.   In

23   rejecting the treating physicians' opinions, the ALJ adopted the

24   opinion of Dr. Landau, the medical expert.  (AR 41, 48, 84).  Dr.

25   Landau testified at the ALJ Hearing that Plaintiff was precluded

26   from forceful gripping, gasping or twisting, but not precluded

27   from frequent fine and gross manipulation, as required for

28   keyboarding, opening drawers and carrying files.   (AR 84).

1    According to Dr. Landau, Plaintiff could also lift and carry ten

2    pounds frequently and twenty pounds occasionally. (Id.).   Dr.

3    Landau's opinion is not supported by substantial evidence in the

4    record.   The ALJ failed to provide specific and legitimate

5    reasons for disregarding the opinions of treating physicians who

6    cared for the Plaintiff for several year years and provided

7    opinions supported by extensive treatment records.   See 20 C.F.R.

8    §§ 404.1527(d)(2), (3); see also Holohan, 246 F.3d at 1207.

9

10       The ALJ also failed to provide clear and convincing reasons

11   for rejecting the uncontradicted findings of treating neurologist

12   Andrew Morovati, as required.   See Lester, 81 F.3d at 830;

13   Holohan, 246 F.3d at 1202.   The ALJ rejected Dr. Morovati's

14   opinions because the "objective medical evidence" failed to

15   support his assessments of Plaintiff, and because Plaintiff's

16   treatment history reflects recent improvement in the frequency of

17   her migraines.   (AR 47).   These two reasons are not clear and

18   convincing because they lack substantial support in the record.

19

20       Plaintiff received treatment for migraines from Drs. Florin

21   and Morovati beginning in March 2010.   Dr. Florin found that

22   Plaintiff's headaches occur more than once a week, last two to

23   three hours each, two to three times a day, cause nausea, and are

24   throbbing and pulsating.   (AR 841).   He opined that migraines

25   would interfere with Plaintiff's ability to work and that she

26   would miss two to three workdays each week.   Id.   Similarly, Dr.

27   Morovati found that Plaintiff's headaches are severely intense,

28   accompanied by nausea and photosensitivity, occur daily for up to

eight hours, sometimes lasting the entire day, and have no specific triggers. (AR 2144). He opined that Plaintiff's symptoms would frequently be severe enough to interfere with her attention and concentration, that she would be incapable of tolerating even a "low stress" work environment and that she would likely miss more than three workdays each month because of her headaches. (AR 2146-47).

The treating neurologists' notes show that Botox injections were somewhat effective in relieving Plaintiff's symptoms in late 2010. However, by September 2011, Plaintiff reported that the injections were no longer consistently effective and none of the oral medications worked. (AR 2084-920, 2347). Her headaches became responsive to Botox injections again in November 2011 and January 2012, but as of April 2013 they were "uncontrolled off Botox." (AR 2490). Plaintiff had not had Botox treatments in the preceding ten months, as her insurer would not approve such frequent injections. (AR 2494-95). These medical records are consistent with Plaintiff's testimony at the hearing before the ALJ, where she testified that she gets migraines every day and that she has tried different treatments for her migraines but "nothing works." (AR 95).

The ALJ rejected the opinions of the treating neurologists for two reasons. First, the ALJ opined that "[t]he objective medical evidence, including the normal brain MRI and an absence of significant neurological abnormalities," failed to support the neurologists' restrictions on Plaintiff. However, neurological

examinations did show that her headaches are caused by neurological abnormalities, specifically cervical dystonia. (AR 839, 836-37). Examinations showed moderate bilateral suboccipitalis and temporalis tenderness, cervical dystonia with 30 degrees anterocolis and 30 degrees right lateral shift, and slightly reduced cervical extension and rotation. Id. The ALJ noted that Plaintiff's brain MRI was "normal," but did not rely on any opinion from a medical professional in arriving at his conclusion that a normal brain MRI undermines Morovati and Florin's restrictions on Plaintiff. Second, the ALJ opined that the neurologists failed to account for "recent improvement" in the frequency of Plaintiff's migraines. (AR 47). However, the record shows substantial evidence supporting the neurologists' assessments that Plaintiffs' migraines remained severe and constant. Thus, because the ALJ did not provide clear and convincing reasons supported by substantial evidence for rejecting the treating neurologists' opinions, remand is required.

Plaintiff also claims that the ALJ's finding at step two that Plaintiff's depression imposes no mental restrictions on her overall functional capacity is based on error. (Compl. at 18-20). The Court agrees with this contention. By its own terms, the evaluation at step two is a de minimis test intended to weed out the most minor of impairments. See Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (step two is "de minimis threshold"); Smolen, 80 F.3d at 1290 (internal quotations and citations omitted). Where there is evidence of a mental

1   impairment that prevents a claimant from working, however, the

2   Agency supplements the five-step sequential evaluation process

3   with additional inquiries.  <u>Maier v. Comm'r</u>, 154 F.3d 913, 914-15

4   (9th Cir. 1998) (per curiam) (citing 20 C.F.R. § 416.920a).

5   Here, the degree of treatment received by Plaintiff for her

6   depression, combined with the medical evidence and her own

7   testimony, confirms that Plaintiff's mental impairment qualified

8   as a "severe" impairment at step two.  (AR 2179, 2190-96, 2242).

9   Remand is required on this ground, as well.

10

11  **B.   If The Treating Physicians' Opinions Were Given Proper**

12       **Weight, Plaintiff Would Be Found Disabled**

13

14       The Court must ordinarily remand for an award of benefits

15  where "(1) the record has been fully developed and further

16  administrative proceedings would serve no useful purpose; (2) the

17  ALJ has failed to provide legally sufficient reasons for

18  rejecting evidence, whether claimant testimony or medical

19  opinion; and (3) if the improperly discredited evidence were

20  credited as true, the ALJ would be required to find the claimant

21  disabled on remand."  <u>Garrison v. Colvin</u>, 759 F.3d 995, 1020 (9th

22  Cir. 2014) (citing, <u>inter alia</u>, <u>Lingenfelter v. Astrue</u>, 504 F.3d

23  1028, 1041 (9th Cir. 2007); <u>Orn</u>, 495 F.3d at 640; <u>Smolen</u>, 80 F.3d

24  at 1292).   The "credit-as-true" rule allows courts the

25  flexibility to remand for further proceedings, rather than an

26  award, only where the record as a whole "creates serious doubt"

27  that a claimant is disabled.  <u>Id.</u> at 1021.

28  \\

Here, if the opinions of Plaintiff's treating physicians had been properly weighted, the ALJ would have found Plaintiff unable to perform fine and gross manipulations, the lifting and carrying requirements of light work, or the non-exertional requirements of full-time work.  The V.E. testified that Plaintiff would not be able to perform the work of an office clerk if she could only occasionally use her hands for fine manipulation and gross-handling.  (AR 100).  The V.E. also testified that "there would be no work," if Plaintiff were to regularly miss two days of work a month because of medical impairments.  (Id.).  If fully credited, the treating physicians' medical evidence regarding Plaintiff's migraines would support a finding that Plaintiff would regularly miss two days or more of work each month.  Finally, a person who experiences extreme pain for up to one third of the day, during which he or she cannot focus even on simple and repetitive tasks, like Plaintiff, "could not work."  (AR 101).  The Court is satisfied that the record has been fully developed, that further administrative proceedings would serve no useful purpose, and that if the discounted evidence were credited as true, Plaintiff would be entitled to benefits.

\\

\\

\\

\\

\\

\\

\\

1

## VIII.

2

### CONCLUSION

3

4        Consistent with the foregoing, it is ORDERED that Judgment

5 be entered REVERSING the decision of the Commissioner and

6 REMANDING this action for the award of benefits.  The Clerk of

7 the Court shall serve copies of this order and the Judgment on

8 counsel for both parties.

9

10 DATED:   June 29, 2015

11

                                        /S/
12                              SUZANNE H. SEGAL
                               UNITED STATES MAGISTRATE JUDGE
13

14

15 **THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**

16

17

18

19

20

21

22

23

24

25

26

27

28